IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IAN WALKER and STEPHEN KRUSE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 06 C 3447 |
| | ) | |
| S.W.I.F.T. SCRL, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

In this proposed class action lawsuit, plaintiffs Ian Walker ("Walker) and Stephen Kruse ("Kruse") allege that defendant S.W.I.F.T. SCRL ("SWIFT") violated their constitutional and statutory rights when it disclosed certain financial records to the United States government.

For the reasons stated below, SWIFT's Motion to Dismiss the Amended Complaint[1] for Failure to State a Claim (Dkt. No. 13) is granted in part and denied in part. Count I is dismissed with prejudice. Counts II and III may remain as pleaded. Count IV is dismissed without prejudice. Plaintiffs are granted leave to file a Third Amended Complaint for purposes of correcting the pleading defects in relation to Count IV, as well as including Counts II and III in a renumbered complaint format, on or before June 29, 2007. The date for the filing of defendant's answer will be set thereafter.

---

[1] After the filing of SWIFT's original motion to dismiss, the court granted Walker leave to file a Second Amended Complaint for purposes of adding Kruse as a named plaintiff. SWIFT's motion therefore now addresses the Second Amended Complaint. (*See* Dkt. No. 31.)

1

BACKGROUND

On June 23, 2006, the *New York Times* published an article titled "Bank Data Sifted in Secret by U.S. to Block Terror" ("Article" Dkt. No. 13, Ex. B).[2] The Article disclosed that "[u]nder a secret Bush administration program initiated weeks after the Sept. 11 attacks, counterterrorism officials have gained access to financial records from a vast international database and examined banking transactions involving thousands of Americans and others in the United States." (Article at 1). The database, described in the Article as "the nerve center of the global banking industry," belongs to defendant SWIFT. (Article at 2).

SWIFT is an international cooperative consortium based in Brussels, with its principal American place of business in northern Virginia.[3] (Dkt. No. 16 at 1). SWIFT's services include "supplying secure, standardized messaging services and interface software to 7,800 financial institutions in more than 200 countries." (2d Am. Compl. ¶ 3). SWIFT routes more than 11 million financial transactions each day, and "virtually every major commercial bank, as well as brokerage houses, fund managers and stock exchanges, uses its services." (2d Am. Compl. ¶ 14). At issue in this case is SWIFT's response to subpoenas issued by the Treasury Department

---

[2] For purposes of a 12(b)(6) motion to dismiss, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993). The Article is central to the claims in this case, in that Walker and Kruse cite to and quote the Article in their Second Amended Complaint and they also assert that the publication of the Article allowed them to "discover the existence of . . . the violations of law alleged herein." (2d Am. Compl. ¶ 2). The court thus accepts the Article as part of the pleadings in this case.

[3] In its Motion to Dismiss the Amended Complaint for Forum Non Conveniens, (Dkt. No 16), SWIFT corrects the location of its principal U.S. office, which Plaintiffs had erroneously alleged to be in New York.

under the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et seq*, through a program that eventually became known as the "Terrorist Finance Tracking Program." (2d Am. Compl. ¶¶ 2, 13; Article at 8). Plaintiffs allege that SWIFT's initial response to the government's requests for information was overbroad, in that SWIFT turned over to government officials "the entire SWIFT database." (2d Am. Compl. ¶ 14; Article at 8).

On the same day that the Article was published, having discovered the alleged misconduct, Walker filed a Complaint against SWIFT alleging that his rights had been violated because "Defendant's disclosure of financial records or other information to the United States Government . . . was done without consent or warrants." (Compl. ¶¶ 1-2). Walker's original Complaint specifically alleged that SWIFT had violated section 3402 of the Right to Financial Privacy Act ("RFPA"), 12 U.S.C. §§ 3401 *et seq.*, as well as the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFDBPA"), 815 Ill. Comp. Stat. 505/1 *et seq.* Walker's Complaint was filed as a class action lawsuit, purporting to represent both a nationwide class and an Illinois subclass. On January 4, 2007, Walker amended his Complaint to add both First Amendment and Fourth Amendment claims and on February 27, 2007, Walker filed a Second Amended Complaint, adding Kruse as a named plaintiff.

## LEGAL STANDARD

Under the Federal Rules of Civil Procedure, a complaint generally need not contain more than "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In 1957, the Supreme Court interpreted this language to mean that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

*Conley v. Gibson*, 355 U.S. 41, 47 (1957). In keeping with this long-standing holding, the Seventh Circuit, in an opinion authored by Chief Circuit Judge Easterbrook, recently emphasized that "the plaintiff pleads claims, not facts or legal theories." *Vincent v. City Colleges of Chicago*, No. 06-3082, 2007 WL 1238745, at *3 (7th Cir. Apr. 30 2007). As Chief Judge Easterbrook bluntly put it, "a judicial order dismissing a complaint because the plaintiff did not plead facts has a short half-life." *Id.*

On May 21, 2007, however, the Supreme Court determined that *Conley*'s "no set of facts" language "has earned its retirement." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (May 21, 2007). Noting the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief,'" the Supreme Court held that a viable complaint must include "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*, 127 S. Ct. at 1964-65, 1974. In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 1965. The Supreme Court explained that this new standard "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the claim or element]." *Id.* On the other hand, the Supreme Court noted that "of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)). "[P]rior rulings and considered views of leading commentators" can assist in assessing the plausibility of the plaintiffs' allegations. *Id.* at 1966.

In deciding whether to grant a 12(b)(6) motion to dismiss, the court assumes that all well-pleaded allegations in the complaint are true. *Id.* However, if a complaint includes facts that undermine its own allegations, a plaintiff can plead herself out of court. *Kolupa v. Roselle Park*

*Dist.*, 438 F.3d 713, 715 (7th Cir. 2006). "Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Venture Associates Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).

## STANDING

At the outset of its analysis, this court must first determine whether it has proper jurisdiction over the case brought by Walker and Kruse (collectively "Plaintiffs"). The role of Article III standing is to ensure that federal courts only resolve actual cases or controversies before them. *Winkler v. Gates*, 481 F.3d 977, 979 (7th Cir. 2007). If Plaintiffs do not have standing in the alleged controversy, the court does not have jurisdiction to hear their claims. *See Allen v. Wright*, 468 U.S. 737, 751 (1984) ("Standing doctrine embraces several judicially self-imposed limits on the exercise of federal jurisdiction [as well as] a core component derived directly from the Constitution"). To establish Article III standing, a plaintiff must have suffered (1) an injury in fact; (2) fairly traceable to defendant's conduct; and (3) likely to be redressed by a favorable decision. *Wernsing v. Thompson*, 423 F.3d 732, 743 (7th Cir. 2005) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561. As the Supreme Court has articulated this burden:

> [E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. . . . At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'

*Id.* (citations omitted).

In this case, SWIFT alleges that Plaintiffs do not have standing because they have failed to plead an injury in fact. In other words, they have not demonstrated that they are "among the injured." *Id.* (citing *Sierra Club v. Morton*, 405 U.S. 727, 740-741, n. 16 (1972)). An injury in fact must be both concrete and particularized, as well as actual or imminent. *Lujan*, 504 U.S. at 560. "An interest shared generally with the public at large in the proper application of the Constitution and laws will not do." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997). On the other hand, "standing is not to be denied simply because many people suffer the same injury." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 687-88 (1973).

For the most part, Plaintiffs do not plead specific facts to establish that they have suffered an injury in fact. Plaintiffs only allege that they "completed numerous domestic financial transactions and at least one international financial transaction since September 11, 2001." (2d Am. Compl. ¶¶ 10-11). They do not otherwise indicate the nature of their financial transactions or the names of the banks or financial institutions through which the transactions were completed; they do not allege that their banks or financial institutions used SWIFT software; and they do not specifically allege that information about their transactions was recorded in the SWIFT database.

Some of these holes are filled in by the *New York Times* article of June 23, 2006. According to the Article, "[m]ost routine financial transactions confined to this country are not in the database." (Article at 2). However, "a small fraction of SWIFT's records involve transactions entirely within this country." (Article at 3). Also, "virtually every major commercial bank, as well as brokerage houses, fund managers and stock exchanges, uses its

services." (Article at 4). "One person involved in the SWIFT program estimated that analysts had reviewed international transfers involving 'many thousands' of people or groups in the United States." (Article at 5). In searching the SWIFT database, "[c]ustomers' names, bank account numbers and other identifying information can be retrieved." (Article at 5). Furthermore, "one person close to the operation" said that SWIFT initially turned over to the federal government "everything – the entire SWIFT database." (Article at 8).

At this stage in the proceedings, Plaintiffs need not allege the specific factual basis that supports their standing to bring this lawsuit. "[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice." *Lujan*, 504 U.S. at 561; *see also Bell Atlantic Corp.*, 127 S. Ct. at 1959 ("a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations"). Plaintiffs do allege that "[b]y the acts alleged herein, SWIFT's conduct proximately caused harm to Plaintiffs." (2d Am. Compl. ¶ 41). Taken as a whole, the allegations in the Second Amended Complaint and the relevant Article are sufficient to put SWIFT on notice of the particular harm alleged to have been suffered by Walker and Kruse, and it is plausible on these allegations that Walker and Kruse may have suffered an injury in fact. No more is required at this stage in the proceedings. SWIFT's motion to dismiss on these grounds is denied.

## ANALYSIS

Having determined that Plaintiffs have set forth sufficient allegations to support their standing, the court now proceeds to the merits of SWIFT's substantive arguments.

1.      Immunity under the International Emergency Economic Powers Act

SWIFT first argues that the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701, *et seq*, immunizes it from liability for its actions in response to the Treasury Department subpoenas. In relevant part, the IEEPA provides that "[n]o person shall be held liable in any court for or with respect to anything done or omitted in good faith in connection with the administration of, or pursuant and in reliance on . . . any regulation, instruction, or direction issued under this chapter." 50 U.S.C. § 1702(a)(3). SWIFT argues that the Second Amended Complaint makes clear that SWIFT responded in good faith to the Treasury Department subpoenas, which were issued pursuant to the IEEPA. According to SWIFT's argument, SWIFT is therefore immune from the claims alleged in Plaintiffs' lawsuit.

Generally, complaints need not anticipate or attempt to defuse potential defenses. *Doe v. Smith*, 429 F.3d 706, 709 (7th Cir. 2005); *see also Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) ("[b]ecause an immunity defense usually depends on the facts of the case, dismissal at the pleading stage is inappropriate"). On the other hand, the Seventh Circuit has upheld the dismissal of a claim when the complaint and attached exhibits clearly demonstrated the defendant's good faith reliance on a court-issued subpoena. *McCready v. eBay, Inc.*, 453 F.3d 882, 891-92 (7th Cir. 2006).

In this case, Plaintiffs do not specifically address the question of "good faith" as it pertains to SWIFT's actions in response to the government subpoenas. However, Plaintiffs do allege that SWIFT turned over to the government "the entire SWIFT database" without "judicial or other lawful authorization." (2d Am. Compl. ¶¶ 14, 46). Presumably, a subpoena issued under the IEEPA would constitute "lawful authorization." It thus appears clear that Plaintiffs

8

allege something other than mere compliance with a government-issued subpoena.

The Article quotes SWIFT's own statement that "SWIFT has made clear that it could provide data only in response to a valid subpoena." (Article at 8). However, the Article also asserts that "SWIFT executives have been uneasy at times about their secret role," ultimately agreeing to continue providing data "only after . . . new controls were introduced." (Article at 3). These allegations are susceptible to an inference that at some point in time SWIFT officials were aware that their disclosures were legally suspect, but they nevertheless continued to supply database information to the U.S. government. The allegations contained in the Article do not support SWIFT's argument that its actions were clearly grounded in good faith reliance on the Treasury Department subpoenas.

Because the allegations of the Second Amended Complaint, and the relevant Article, do not themselves establish SWIFT's IEEPA immunity, the court denies SWIFT's motion to dismiss Plaintiffs' claims on these asserted grounds.

2.  Counts I and II – First and Fourth Amendments

In Count I of their Second Amended Complaint, Plaintiffs allege that they "have a Constitutionally guaranteed right to free speech in the form of financial donations, contributions, or other expression of political, religious, or other personal beliefs through their financial transactions," and that SWIFT "denied Plaintiffs and class members their rights to speak and receive speech privately under the First Amendment." (2d Am. Compl. ¶¶ 36, 40). In its Motion to Dismiss the Amended Complaint for Failure to State a Claim, SWIFT cites to *Fischer v. United States*, 425 U.S. 391, 401 n.7 (1976), for the proposition that "First Amendment values" are "plainly not implicated" in the subpoena of financial records. Because Plaintiffs do not make

9

any attempt to distinguish *Fischer*, or to even address their First Amendment claims at all in their responsive briefing, the court grants SWIFT's motion to dismiss Count 1 of the Second Amended Complaint. Count I is dismissed with prejudice.

In Count II of their Second Amended Complaint, Plaintiffs argue that SWIFT "violated [their] reasonable expectations of privacy and denied . . . their right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment to the Constitution of the United States." (Compl. ¶ 47). In *United States v. Miller*, the Supreme Court held that individuals have no legitimate expectation of privacy regarding financial information "voluntarily conveyed to . . . banks and exposed to their employees in the ordinary course of business." *United States v. Miller*, 425 U.S. 435, 442-43 (1976). The Court concluded that "[s]ince no Fourth Amendment interests of the depositor are implicated . . ., this case is governed by the general rule that the issuance of a subpoena to a third party to obtain the records of that party does not violate the rights of [the depositor.]" *Miller*, 425 U.S. at 444. It thus is clear that private citizens have no Fourth Amendment rights in financial records created and shared in the ordinary course of business.

However, it is also apparent that there may be limitations to the scope of *Miller*'s holding. In both *Miller* and its predecessor case, *California Bankers Ass'n. v. Shultz*, 416 U.S. 21 (1974), the Supreme Court implied in *dicta* that unfettered government access to the bank records of private citizens could be considered constitutionally problematic.

In *California Bankers Ass'n*, the plaintiffs argued that their Fourth Amendment rights were in jeopardy because, pursuant to the Bank Secrecy Act of 1970, the Secretary of the Treasury "could order the immediate reporting of any records made or kept under the

10

compulsion of the Act." *California Bankers Ass'n*, 416 U.S. at 53. The Supreme Court ultimately determined that this question was moot, because the Secretary did not in fact "require the reporting of any records made or kept under the compulsion of the Act." *Id.* at 54. However, the Court also emphasized that "the legislative history of the Act clearly indicates that records which it authorized the Secretary to require were to be available only by normal legal process, [thus] it is doubtful that the Secretary would have the authority ascribed to him by plaintiffs even under the earlier form of the regulation." *Id.* The Court also noted that "both the legislative history and the regulations make specific reference to the fact that access to the records is to be controlled by existing legal process."

The scope of "existing legal process" was clarified, to some extent, in *Miller*, where the Court determined that the subpoena at issue was not outside the bounds of "existing legal process" simply because it sought to obtain bank records of a depositor's account. *Miller*, 425 U.S. at 446. However, the Court also specifically noted that:

> We are not confronted with a situation in which the Government, through "unreviewed executive discretion," has made a wide-ranging inquiry that unnecessarily "touch(es) upon intimate areas of an individual's personal affairs." *California Bankers Assn. v. Shultz*, 416 U.S. [21, 78-79 (1974)] (Powell, J., concurring). Here the Government has exercised its powers through narrowly directed subpoenas Duces tecum subject to the legal restraints attendant to such process.

*Miller*, 425 U.S. at 444. The Court's *dicta* suggests that a different Fourth Amendment analysis could be required if the government's action was unusually broad in scope.

Furthermore, Plaintiffs have alleged that SWIFT disclosed more information than was requested by the government subpoenas, as discussed in detail below. This, too, brings the case outside the bounds of "existing legal process." The majority in *Miller* specifically distinguished

11

that case from the case of *Burrows v. Superior Court*, 529 P.2d 590 (Cal. 1974), on the grounds that "the bank records of respondent's accounts were furnished in response to 'compulsion by legal process' in the form of subpoenas Duces tecum" unlike *Burrows*, where "the bank . . . provided the statements to the police in response to an informal oral request for information." *Miller*, 425 U.S. at 445 n.7. This distinction is included in the Supreme Court's analysis of whether the subpoena in *Miller* should have been subject to "more stringent Fourth Amendment requirements than is the ordinary subpoena." *Id.*

Based on the foregoing analysis, the court finds SWIFT's argument that *Miller* necessarily precludes Plaintiffs' Fourth Amendment claims to be unpersuasive. On its face, *Miller* does not preclude Plaintiffs' Fourth Amendment claims as set forth in the Second Amended Complaint. SWIFT's motion to dismiss Count II on these grounds is therefore denied.

The remaining question in the analysis of Plaintiffs' Fourth Amendment claims is whether Plaintiffs have properly alleged that SWIFT is a state actor. In their Second Amended Complaint, Plaintiffs allege that "[b]y the acts alleged herein, SWIFT acted as an instrument or agent of the government." (2d Am. Compl. ¶ 47). As further described in their brief before the court, it is Plaintiffs' position that "SWIFT was a willing, gratuitous supplier of its database to the government," supplying information in excess of that requested by official subpoena.[4] (Dkt. No. 22 at 10). Plaintiffs assert that these actions make SWIFT "a direct and willing partner in

---

[4] The court notes there exists a slight tension between this statement and Plaintiffs' allegation that "the United States Government did not seek individual court-approved warrants or subpoenas to examine specific transactions for millions of records." (2d Am. Compl. ¶ 16). However, the court finds that the allegation in paragraph sixteen of the Second Amended Complaint does not preclude Plaintiffs' argument that the government issued *broad* subpoenas of SWIFT's database information, and that SWIFT responded to these subpoenas by turning over the entire database.

the government's surveillance program." (Dkt. No. 22 at 10).

SWIFT argues that mere compliance with a government-issued subpoena cannot turn a private citizen into a government actor. However, Plaintiffs have never alleged that SWIFT's actions were taken in compliance with government subpoenas. Rather, Plaintiffs argue that SWIFT acted outside the bounds of any subpoena, proceeding without "judicial or other lawful authorization." (2d Am. Compl. ¶ 46).

At this point in the proceedings, Plaintiffs' burden is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp.*, 127 S. Ct. at 1959 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). This includes setting forth "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. In this case, the court finds that Plaintiffs have alleged sufficient facts to suggest that state action on the part of SWIFT is plausible. While Plaintiffs will eventually have to prove sufficient facts to establish that SWIFT acted as "an instrument or agent of the government," at this point in the proceedings Plaintiffs' allegations will suffice to state a constitutional cause of action. SWIFT's motion to dismiss Count II of the Second Amended Complaint is denied.

3.  Count III – Right to Financial Privacy Act

In response to the Supreme Court's holding in *Miller*, Congress enacted the Right to Financial Privacy Act, 12 U.S.C. §§ 3401, *et seq*. ("RFPA"), establishing statutory protections for certain financial information. *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 745 n.15 (1984). In Count III of the Second Amended Complaint, Plaintiffs allege that SWIFT violated the RFPA by "disclos[ing] information contained in customer financial records without reasonable description or any of the other five criteria enumerated [in § 3402]." (2d Am. Compl. ¶¶ 50-51).

Section 3402 states, in full:

> Except as provided by section 3403(c) or (d), 3413, or 3414 of this title, no Government authority may have access to or obtain copies of, or the information contained in the financial records of any customer from a financial institution unless the financial records are reasonably described and –
>
> (1) such customer has authorized such disclosure in accordance with section 3404 of this title;
> (2) such financial records are disclosed in response to an administrative subpoena or summons which meets the requirements of section 3405 of this title;
> (3) such financial records are disclosed in response to a search warrant which meets the requirements of section 3406 of this title;
> (4) such financial records are disclosed in response to a judicial subpena [sic] which meets the requirements of section 3407 of this title; or
> (5) such financial records are disclosed in response to a formal written request which meets the requirements of section 3408 of this title.

12 U.S.C. § 3402.

The Supreme Court has noted that "[t]he most salient feature of the [RFPA] is the narrow scope of the entitlements it creates." *O'Brien, Inc.*, 467 U.S. at 745. By its own terms, § 3402 of the RFPA only applies to the financial records of "customer[s]" of "financial institution[s]." A "financial institution" is defined as:

> any office of a bank, savings bank, card issuer . . ., industrial loan company, trust company, savings association, building and loan, or homestead association (including cooperative banks), credit union, or consumer finance institution, located in any State or territory of the United States, the District of Columbia, Puerto Rico, Guam, American Samoa, or the Virgin Islands

12 U.S.C. § 3401(1). As a supplier of messaging services to financial institutions, it is clear from the allegations in the Second Amended Complaint, as well as the Article, that SWIFT does not fit this definition of a financial institution. Plaintiffs' conclusory statement that SWIFT "acted as a financial institution" is not enough to make it so. *See Bell Atlantic Corp.*, 127 S. Ct. at 1964-65 ("a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief"

14

requires more than labels and conclusions"). In contradiction to this stated conclusion, Plaintiffs have alleged that SWIFT "provid[es] electronic instructions on how to transfer money among 7,800 financial institutions worldwide." (2d Am. Compl. ¶ 14; Article at 4). Thus, unlike the institutions listed in § 3401(1), SWIFT serves other financial institutions rather than the public at large. Additionally, as a service to these financial institutions, SWIFT "suppl[ies] secure, standardized messaging services and interface software." (2d Am. Compl. ¶ 3). It appears that SWIFT's role is to facilitate communications about financial transactions, rather to actually conduct financial transactions itself. The court takes judicial notice of similar descriptions of SWIFT's services in other court opinions. *See Buchbinder v. Natanzon*, No. 06-1078, 2006 WL 3327694, at *1 n.1 (4th Cir. Nov. 16, 2006) (describing SWIFT as a "global banking telecommunications network"); *Hamilton Bank N.A. v. Kookmin Bank*, 44 F. Supp. 2d 653, 656 n.12 (S.D.N.Y. 1999), *aff'd in part, vacated in part on other grounds*, 245 F.2d 83 (2d Cir. 2001) ("SWIFT is a secured means of communication among financial institutions used primarily to confirm financial transactions"). This, too, distinguishes SWIFT from the institutions listed in § 3401(1). Based on these factors, as alleged by Plaintiffs, the court finds that Plaintiffs are precluded from arguing that SWIFT is a financial institution under the terms of the RFPA.

However, Plaintiffs also allege that SWIFT "acted as an agent of a financial institution or institutions," (2d Am. Compl. ¶ 4), and they note that § 3403(a) expands the protections of § 3402 such that "No financial institution, or officer, employees, *or agent of a financial institution*, may provide to any Government authority access to or copies of, or the information contained in, the financial records of any customer except in accordance with the provisions of this chapter." (emphasis added). Although Plaintiffs fail to specifically reference § 3403(a) in

15

their Second Amended Complaint, their intent to rely on agency theory is apparent from their allegation that SWIFT "acted as an agent of a financial institution or institutions." (2d Am. Compl. ¶ 4).

SWIFT argues that Plaintiffs cannot allege that SWIFT functioned both as an agent of the government and as an agent of a financial institution. This is not correct. Federal Rule of Civil Procedure 8(e) allows Plaintiffs to plead in the alternative, even when the two claims are ultimately inconsistent with each other. Although proof of the alleged agency relationship will certainly be required before Plaintiffs can prevail on their RFPA claim, the court finds that Plaintiffs have alleged the necessary agency relationship to establish liability under §§ 3402 and 3403(a). As discussed above, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atlantic Corp.*, 127 S. Ct. at 1959. Consistent with the other allegations of the Second Amended Complaint and the Article, the court finds it plausible that SWIFT was acting as an agent of its member financial institutions when it disclosed financial records to the government.

SWIFT next argues that Plaintiffs are not "customers" as defined by § 3401(5). The RFPA defines "customer" as "any person or authorized representative of that person who utilized or is utilizing any service of a financial institution, or for whom a financial institution is acting or has acted as a fiduciary, in relation to an account maintained in the person's name." 12 U.S.C. § 3401(5). Relying on the agency aspects of § 3403(a), Plaintiffs argue that so long as they have a customer relationship with a financial institution, and SWIFT acts as an agent of that financial institution, Plaintiffs must have standing to assert a claim under the RFPA. The court agrees. The allegations in the Second Amended Complaint are sufficient to support Plaintiffs'

16

argument that they could qualify for the protections of the RFPA as "customers" of financial institutions, which in turn relied upon SWIFT as their agent. Any other interpretation would eviscerate the meaning of § 3403(a).

Finally, SWIFT argues that 12 U.S.C. § 3414(a)(1)(C) functions to exempt SWIFT from the RFPA's requirements. Section 3414(a)(1)(C) specifically states that:

> (a)(1) Nothing in this chapter (except sections 3415, 3417, 3418, and 3421 of this title) shall apply to the production and disclosure of financial records pursuant to requests from –
>
> (C) a Government authority authorized to conduct investigations of, or intelligence or counterintelligence analyses related to, international terrorism for the purpose of conducting such investigations or analyses.

12 U.S.C. § 3414(a)(1)(C). As discussed above, it is generally inappropriate to resolve affirmative defenses in response to a 12(b)(6) motion to dismiss. In this case, Plaintiffs specifically allege that SWIFT was *not* acting pursuant to authorized government authority when it disclosed its database information to the government. Neither the Second Amended Complaint nor the Article set forth any allegations that require the exemption in § 3414(a)(1)(C) to be applied, and the court denies SWIFT's request to dismiss on these grounds.

For the reasons stated above, the court denies SWIFT's motion to dismiss Count III of the Second Amended Complaint.

4. <u>Illinois Consumer Fraud and Deceptive Business Practices Act</u>

Lastly, Kruse alleges that SWIFT engaged in unfair, unlawful and/or fraudulent business practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("CFDBPA"), 815 Ill. Comp. Stat. 505/1 *et seq*. Section 10a(a) of the CFDBPA creates a private cause of action for violations of the statute's provisions. 815 Ill. Comp. Stat. 505/10a(a). "To

prove a private cause of action under section 10a(a) of the Act, a plaintiff must establish: (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in the course of conduct involving trade or commerce, and (4) actual damage to the plaintiff (5) proximately caused by the deception." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 850 (Ill. 2005).

Recovery may also be had for conduct that is unfair. *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002) (citing *Saunders v. Michigan Ave. Nat'l Bank*, 662 N.E.2d 602 (Ill. Ct. App. 1996). Factors to consider on the question of fairness include "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers." *Id.* at 961 (citing *Federal Trade Comm'n v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972)).

"A complaint alleging a violation of the Illinois Fraud Act must be pled with the same particularity and specificity as that required under common law fraud under Rule 9(b)." *Costa v. Mauro Chevrolet, Inc.*, 390 F. Supp. 2d 720, 731 (N.D. Ill. 2005) (citations omitted). Thus, the Plaintiffs must allege the "what, where and when of the fraud" in their Second Amended Complaint. *Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins.*, 412 F.3d 745, 749 (7th Cir. 2005).

Plaintiffs allege generally that "Defendant's business practices offend the public policies set forth in the Illinois Constitution" and that "Plaintiffs were, in fact, deceived as to the terms and conditions of services provided by Defendant." (2d Am. Compl. ¶¶ 54, 55). However, Plaintiffs do not identify which Illinois public policies were violated by SWIFT's conduct, what terms and conditions of services were provided to Plaintiffs by SWIFT, when or where such

18

terms and conditions were communicated to Plaintiffs, or how these terms and conditions were misleading. The general averment that "Defendant's acts and practices are also unlawful because . . . they violate the First and Fourth Amendment to the United States Constitution and 12 U.S.C. § 3402," (2d Am. Compl. ¶ 56), is not enough to satisfy the court that a cause of action under the CFDBPA is appropriate.

In their responsive brief, Plaintiffs assert that they "will seek to establish that classmembers paid various banking and transaction fees to their banks and SWIFT and that this financial loss, in addition to the violation of their constitutional and statutory rights . . . provides the substantial injury required by the [Illinois Consumer Fraud Act]." (Dkt. No. 22 at 14). Because these allegations were not set forth with particularity in the Second Amended Complaint, Plaintiffs fail to allege their CFDBPA claims in accordance with Rule 9(b).

Additionally, the Illinois Supreme Court has held that the CFDBPA applies in situations where "the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois." *Avery*, 835 N.E.2d at 854. In this case, the only connection to the state of Illinois is the fact that plaintiff Kruse is a resident of Illinois. While this is one factor to consider, the court finds no substantial connection to Illinois on the face of the Second Amended Complaint. Plaintiffs have not alleged that the alleged disclosures took place in Illinois, that the subpoenas were served in Illinois, that SWIFT maintained any records in Illinois, that Kruse or Walker entered into any financial transactions in Illinois, or that Kruse or Walker had any interactions with SWIFT that took place in Illinois.

Plaintiffs' CFDBPA claim must be dismissed because Plaintiffs fail to plead their claim

19

with the requisite level of particularity and fail to allege a substantial nexus to the state of Illinois. Count IV is dismissed without prejudice, and Plaintiffs are granted leave to file a Third Amended Complaint for purposes of correcting these defects.

## CONCLUSION

For the reasons stated above, SWIFT's Motion to Dismiss the Amended Complaint for Failure to State a Claim is granted in part and denied in part. Count I is dismissed with prejudice. Counts II and III may remain as pleaded. Count IV is dismissed without prejudice. Plaintiffs are granted leave to file a Third Amended Complaint for purposes of correcting the pleading defects in relation to Count IV, as well as including Counts II and III in a renumbered complaint format, on or before June 29, 2007. The date for the filing of defendant's answer will be set thereafter.

ENTER:

*[signature: James F. Holderman]*
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: June 12, 2007